RECEIVED
JUL - 5 2006
ROBERT H. SHEMWELL, CLERK
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE, LOUISIANA

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF LOUISIANA
# LAFAYETTE-OPELOUSAS DIVISION

| | | |
|---|---|---|
| **RODNEY JOHNSON** | * | **CIVIL ACTION NO. 05-1305** |
| **VERSUS** | * | **JUDGE DOHERTY** |
| **COMMISSIONER OF SOCIAL SECURITY** | * | **MAGISTRATE JUDGE HILL** |

## REPORT AND RECOMMENDATION

This social security appeal was referred to me for review, Report and Recommendation pursuant to this Court's Standing Order of July 8, 1993. Rodney Johnson, born June 17, 1958, protectively filed an application for disability insurance benefits on January 17, 2003, alleging disability since March 10, 2002, due to a back injury, leg and hip pain, high blood pressure, and diabetes.

## FINDINGS AND CONCLUSIONS

After a review of the entire administrative record and the briefs filed by the parties, and pursuant to 42 U.S.C. § 405(g), I find that there is not substantial evidence in the record to support the Commissioner's decision of non-disability. *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

In fulfillment of F.R.Civ.P. 52, I find that the Commissioner's findings and conclusions regarding claimant's disability is not supported by substantial evidence,

based on the following:

**(1) Records from Dr. Arthur L. Sarris dated March 20, 2002.** Claimant complained of back and left leg pain with numbness and tingling after loading luggage onto a bus while working as for Greyhound as a driver. (Tr. 113). He was injured on February 22, 2002, and stopped working on March 10, 2002. On examination, he had spasms, restriction of motion, positive straight leg raising, diminished left reflexes, an abnormal sensory dermatome pattern, some weakness to the left lower extremity, and trouble getting on his heels and toes. (Tr. 114). Dr. Sarris' impression was an injury to the lumbar area with radiation to the lower extremities and motor and sensory disturbances. He recommended that claimant continue to stay off of work.

**(2) Records from Dr. Parker Meyer dated February 16, 2001 to September 24, 2002.** Dr. Meyer treated claimant for diabetes and hypertension. (Tr. 125). On March 15, 2002, claimant complained of low back pain after lifting luggage. He was referred for physical therapy. (Tr. 117-21).

On May 6, 2002, claimant was still having low back pain with occasional pain in his left leg. (Tr. 125). X-rays showed mild disc space narrowing and anterior degenerative spurs from T10-11 to L5-S1. (Tr. 124). Dr. Meyer noted that claimant was not taking any of his hypertensive or diabetes medicine because he could not

2

afford the co-pay. (Tr. 125). He referred claimant to an orthopedist, Dr. Ozanne. (Tr. 122).

**(3) Report from Dr. George E. Medley dated December 5, 2002**. Claimant complained of low back and right leg pain. (Tr. 127). On examination, he had obvious muscle spasm in his lower back. (Tr. 128). He had a shortening in the right leg due to an old hip problem. He had very limited lumbar motion, and limitation of motion in the right hip. Deep tendon reflexes were normal, and there were no signs of weakness. Claimant had slight decreased sensation in the right calf. Straight leg raising was positive at 30 degrees on the right, and 40 degrees on the left. Sciatic nerve stretch test was positive on both sides.

Claimant had no measurable calf atrophy, but his right calf was one-half inch larger than the left. (Tr. 129). He had one inch of shortening involving the right lower extremity. MRI studies demonstrated disc herniation at L5-S1.

Dr. Medley's impression was a herniated lumbar disc with right-side nerve root compression, and degenerative joint disease of the right hip. Dr. Medley stated that claimant could not return to work at that time. (Tr. 130). He noted that claimant had failed conservative treatment, and opined that claimant was a candidate for lumbar disc surgery.

**(4) Records from Dr. Stephen Ozanne dated May 30, 2002 to January 3, 2003.** On May 30, 2002, claimant was seen for low back pain. (Tr. 162). An MRI dated June 6, 2002, showed disc dessication and significant disc bulging with spinal stenosis at L3-4, L4-5, and L5-S1. (Tr. 155). Dr. Ozanne's diagnosis was lumbar stenosis, for which he recommend a lumbar epidural steroid injection.

On November 26, 2002, Dr. Ozanne reported that claimant had continued low back pain with radiation to both legs. (Tr. 137). The injection had provided brief but minimal relief. He had failed to progress, had a consistent pattern of symptomatic spinal stenosis, and been unable to work. Dr. Ozanne recommended decompressive laminectomy across L3-4, L4-5, and L5-S1 to address claimant's spinal stenosis.

**(5) Report from Nick S. Pomonis, D.O., dated March 10, 2003.** Claimant complained of lower back and sciatica pain extending down his legs to his toes, and right shoulder pain. (Tr. 166). On examination, he was unable to heel-walk, had normal toe-walk, and slow gait. (Tr. 167). His motor function strength was about 3.5/5 in his lower extremities due to pain and irritation in the right SI joint area. Two-point discrimination was decreased in the right L5-S1 area.

Deep tendon reflexes were 1.5/4 on the right and 2/4 on the left. Straight leg raising sitting was 80 degrees on the left and 45 degrees on the right, and supine was 45 degrees on the left and 35 degrees on the right. Claimant had no clubbing,

4

cyanosis, or edema of the lower extremities.

Dr. Pomonis' impression was right SI joint dysfunction, degenerative joint disease, herniated disc with right radiculopathy, disc herniation at L4 to S1, and small annular tears and facet joint hypertrophy at L4 to S1. He noted symptom magnification to a moderate degree, but also with very positive clinical radicular symptoms as well. He opined that claimant was not yet at MMI. (Tr. 168).

**(6) Report from Teche Action Clinic dated March 13, 2003.** Claimant presented with a history of hypertension, diabetes, and tobacco use. (Tr. 176). He had run out of medication for quite some time. He was started on Glucotrol XL and anti-hypertensive medications, and educated about smoking cessation.

**(7) Residual Functional Capacity ("RFC") Assessment dated June 27, 2003.** Dr. Lee determined that claimant had the ability to lift/carry 20 pounds occasionally and 10 pounds frequently. (Tr. 178). He found that claimant had the ability to stand/walk and sit for about 6 hours in an 8-hour workday. He had unlimited push/pull ability. He could occasionally perform all postural activities. (Tr. 179). He was limited as to reaching in all directions. (Tr. 180).

**(8) Records from Dr. Stefan G. Pribil dated January 9, 2003 to July 29, 2004.** Claimant complained of low back pain and predominately right leg pain with cramps in both legs. (Tr. 228). He also had right shoulder pain and right arm

weakness. On examination, he had a limp. (Tr. 229). He could get up on his toes and heels, but could not walk in a sustained fashion. Forward bending was limited to 60 degrees, and hyperextension was limited to 10 degrees. He had positive straight leg raising on the right.

Claimant had giveaway in the right hip flexor, knee extensor, and ankle flexors on the right. He had a 4/5 weakness in the right hand deltoid biceps and triceps. His reflexes in were trace to 1 in the upper extremities, zero at the knees, and trace in the ankles. Sensory exam was intact. He had tenderness and mild to moderate spasm in the neck, mid back and low back. (Tr. 230).

Dr. Pribil's impression was a clinically left lumbar radiculopathy, but an extensive lumbar disc herniation at L3-4, L4-5, and L5-S1. He recommended a CT scan.

A CT scan revealed arthritic changes and diffuse disc bulge with moderate to severe stenosis at L3-4, a central and to the right disc herniation with far lateral foraminal bulge on the right at L4-5, and a central disc herniation at L5-S1. (Tr. 211-12). Dr. Pribil recommended surgery.

On May 9, 2003, Dr. Pribil performed a diskogram at L3-4 and L4-5 and endoscopic microdiskectomy at L4-5 and L3-4. (Tr. 191-94). On June 12, 2003, claimant continued to have back pain with some right leg pain. (Tr. 210). Dr. Pribil

6

opined that claimant should be considered "permanently totally disabled given the synergistic action of all his medical problems with a shortened right limb and back surgery and looking possibly at another back surgery if this one does not work."

On July 3, 2003, claimant continued to have pain. (Tr. 206). He had tried physical therapy, but it made him hurt more. He was a little bit depressed as well. Dr. Pribil noted that claimant was contemplating the other surgery, but was not ready.

On July 24, 2003, claimant continued to have significant back and leg pain with weakness. (Tr. 198). The pain was intractable. Dr. Pribil recommended an interbody fusion at 4-5 and 5-1, stating that there was an 80% chance that it would help him and a 20% chance that it would not. Claimant indicated that he wished to proceed.

At examination on September 11, 2003, claimant had positive straight leg raising on the right side; 4/5 weakness of EHL, hip flexor, and knee extensor; mild decreased pinprick along the thigh; knee jerks at 1 to 1+ and ankle jerks at 1 to 2; toes going down; trouble walking on his toes and heels; limited range of motion in forward flexion, and 30% limitation on hyperextension. (Tr. 196). Dr. Pribil opined that claimant had a three-level lumbar disc herniation. He thought that claimant was at about 11% for spinal category, with a 6% for decreased range of motion, and an additional 5% for residual weakness. He opined that claimant's permanent

impairment rating was about 20% for the whole body. Claimant chose not to have surgery at that time because of his concern with diabetes and hypertension.

On February 12, 2004, claimant reported that the pain had gotten worse, and that his right leg was giving out. (Tr. 234). He did not have adequate strength, and was having difficulty walking up and down stairs. On examination, he had difficulty keeping sustained ambulation on his toes. Straight leg rasing was positive on the right side. Knee jerks were 2+, 1-, and 1+. He had mild 4/5 weakness on the left, 4+/5 right hamstring weakness, and 4+/5 right hip flexor weakness. Dr. Pribil recommended diagnostic studies.

On February 26, 2004, Dr. Pribil stated that the CT scan revealed 4 to 5 mm lumbar disc herniations at L3-4, L4-5, and L5-S1. (Tr. 233). He reported that the claimant clearly had internal disc disruption with bulging and compression of the neural foramina with mild to moderate lumbar stenosis and neural foraminal narrowing, more severe at the L4-5 level. He noted that claimant continued to have back with right leg pain, and some left leg pain. Claimant wished to proceed with surgery.

A lumbar myelogram and post-myelogram CT scan dated July 29, 2004, revealed a moderate circumferential disc protrusion and hypertrophy producing moderate spinal canal stenosis with bilateral neural forminal stenosis at L3-L4, and

circumferential disc protrusion with mild spinal canal stenosis at L4-L5. (Tr. 237-38). Claimant had bilateral nerve root sleeve impingement at L3-L4 and mild neural foraminal impingement at L4-L5. (Tr. 237).

**(9) Records from Teche Regional Medical Center dated August 12-27, 2004.** Claimant was admitted for acute coronary syndrome. (Tr. 251). He underwent left heart catheterization, selective coronary arteriography, selective right common femoral angiography, and PCI with drug-eluding stent placement in the left anterior descending coronary. The left anterior descending displayed a 90% area of focal disease. The mid portion of that artery displayed a 20% area of focal disease. After angioplasty, repeat arteriography revealed a 0% residual stenosis in the left anterior descending. (Tr. 252).

An echocardiogram showed ejection fraction of 65 to 70% with no regional wall motion abnormalities. (Tr. 248). Claimant had normal left ventricular systolic and diastolic function, normal cardiac chamber sizes, and normal valvular structure motion.

**(10) Records Teche Action Clinic dated April 4, 2003 to October 7, 2004.** On June 25, 2003, claimant was seen for hypertension and diabetes. (Tr. 263). He had been compliant with his medications. The assessment was DM Type II with microalbuminemia hypertension. He was prescribed Norvasc and Elavil for sleep.

9

On December 9, 2003, claimant complained of a cough. (Tr. 261). The assessment was uncontrolled diabetes, hypertension, and post nasal drip versus a cough.

**(11) Report from Dr. Pribil dated December 9, 2004**. Claimant complained of back, right leg, and lower back pain with numbness, muscle pain, bone pain, and joint pain. (Tr. 273). He had been depressed with night sweats. He had vacuum disc space phenomenon with decreased disc space height at L5-S1, right greater than left leg pain, and disc herniations at L3-4 and L4-5. At that time, claimant wished to be treated with pain management. Dr. Pribil discharged claimant from his care.

**(12) Claimant's Administrative Hearing Testimony**. At the hearing on December 14, 2004, claimant was 46 years old. (Tr. 278). He testified that he was 6 feet tall and weighed 225 pounds. (Tr. 279). He had a Bachelor of Science degree, and had completed truck driving school.

Claimant had worked as a van driver for about a year. Prior to that, he had been a truck driver. (Tr. 280). He had also been a recreational therapist. He had worked for Greyhound as a bus driver for three years. He had stopped working at Greyhound in October, 2002, after he injured his back. (Tr. 280, 283).

Claimant testified that he had recently been employed as a caseworker with juvenile offenders for about three months. (Tr. 280-81). However, he had to stop

because of back pain. (Tr. 281).

As to complaints, claimant testified that he had low back pain, shoulder, and neck pain. (Tr. 297). He stated that the back pain radiated down his right leg all of the time, and occasionally down his left leg. He also had numbness and tingling. Additionally, he had high blood pressure, coronary syndrome, and diabetes. (Tr. 299, 301).

Regarding activities, claimant testified that he was able to dress and groom himself. (Tr. 285). He stated that in the mornings, he ate breakfast sometimes, read the paper, and watched a little television until he could not tolerate it any more. He reported that he had to lie down for about three to four hours or more per day.

Additionally, claimant said that he put dishes in the sink, and put up his clothes. (Tr. 286). He also went to church on Sundays and to prayer service on Thursdays. (Tr. 300). He stated that he hardly ever drove. (Tr. 287).

Claimant testified that he saw doctors once or twice a month for heart problems, pain management, and blood pressure and diabetes. (Tr. 286-87). He said that it was hard to see them on a regular basis because of his finances. (Tr. 287, 302). He reported that his latest heart tests indicated that "everything was looking good." (Tr. 302).

Regarding restrictions, claimant stated that he had pain after walking 15 to 20 yards. (Tr. 298). He also complained of pain after he sat too long. He reported that his medication made him dizzy. (Tr. 299).

**(13) Administrative Hearing Testimony of Doug Kuylen, Vocational Expert ("VE").** Mr. Kuylen described claimant's past work as a bus driver and shuttle driver as medium and semi-skilled, a warehouse supervisor as light and skilled, a truck driver as medium to heavy and semi-skilled, and recreation therapist as light and skilled. (Tr. 305-06). The ALJ posed a hypothetical in which she asked the VE to assume a claimant who could perform sedentary work where he could lift and carry up to 10 pounds occasionally; could sit for at least 6 hours out of an 8-hour workday; could stand/walk at least 2 hours out of 8 hours; could occasionally climb ramps, stairs, balance, stoop, kneel, crouch, and crawl; had to avoid ladders, ropes, and scaffolds, and could occasionally reach in all directions, including overhead. In response, Mr. Kuylen testified that claimant could not return to his past work, but could work as a record clerk, bookkeeping, accounting, and auditing clerk, or payroll and time keeping clerk. (Tr. 308-09). When claimant's attorney modified the hypothetical to include a marked limitation in his ability to be reliable, show up for work, and complete a normal workday because of severe pain, the VE testified that there would be no work available. (Tr. 310). When she asked whether an employer

would be able to accommodate a person who needed to lie down during the day because of pain, Mr. Kuylen responded "No."

**(14) The ALJ's Decision**. Claimant argues that: (1) the ALJ's decision is not supported by substantial evidence; (2) the ALJ made improper and unsupported credibility assessments regarding claimant's lay testimony; (3) the ALJ did not assign proper weight to claimant's treating physicians' opinions; (4) the ALJ erred, as a matter of law, in failing to find that claimant had established a period of disability, and (5) the ALJ erred in substituting her medical opinion for that of claimant's treating physicians. Because the ALJ failed to find that claimant was entitled to a closed period of disability, I find that this case should be **REVERSED,** and that claimant should be awarded benefits from the onset date of March 10, 2002, until claimant was released from Dr. Pribil's care on December 9, 2004. (Tr. 273).

Dr. Pribil indicated on June 12, 2003, that claimant should be considered "permanently totally disabled given the synergistic action of all his medical problems with a shortened right limb and back surgery and looking possibly at another back surgery if this one does not work." (Tr. 210). The ALJ did not give this opinion controlling weight, as she found that Dr. Pribil's remarks were "conclusory" and "inconsistent" with his estimations of claimant's total body impairment. (Tr. 18). First, she cited Dr. Pribil's use of a "vague and medically non-specific term

13

'synergistic action,'" which she found "connotes no specific vocationally-related restrictions." She then determined that Dr. Pribil's assessing claimant with a 20% whole body impairment three months later "conflicts significantly" with his finding of "permanently totally disabled." (Tr. 196).

It is well established that the opinion of a treating physician who is familiar with the claimant's impairments, treatments and responses, should be accorded great weight in determining disability. *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000); *Leggett v. Chater*, 67 F.3d 558, 566 (5th Cir. 1995); *Greenspan v. Shalala*, 38 F.3d 232, 237 (5th Cir. 1994), *cert. denied*, 514 U.S. 1120, 115 S.Ct. 1984, 131 L.Ed.2d 871 (1995). A treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with ... other substantial evidence." *Newton*, 209 F.3d at 455 (citing 20 C.F.R. § 404.1527(d)(2)). Good cause for abandoning the treating physician rule includes disregarding statements by the treating physician that are brief and conclusory, not supported by medically accepted clinical laboratory diagnostic techniques, or otherwise unsupported by evidence. *Leggett*, 67 F.3d at 566; *Greenspan*, 38 F.3d at 237.

The ALJ found that Dr. Pribil's statement as to claimant's disability was "conclusory" and "inconsistent" with his estimations of claimant's whole body impairment. (Tr. 18). However, Dr. Pribil's findings are supported by diagnostic tests, including CT, MRI and myelogram. (Tr. 129, 155, 210, 230, 233, 237-38). The record reflects that claimant had surgery, which failed. (Tr. 191-92, 198, 210). One month post-surgery, Dr. Pribil considered claimant to be "totally disabled." (Tr. 210). The latest diagnostic tests, a myelogram and post-myelogram CT, confirmed that claimant had disc protrusions at L3-L4 and L4-L5 with nerve root impingement. (Tr. 237). At the last visit on December 9, 2004, claimant continued to have pain, and indicated that he wished to be treated with pain management. (Tr. 273). Dr. Pribil then discharged claimant from his care.

In *Myers v. Apfel*, 238 F.3d 617, 620 (5th Cir. 2001), the court held that an ALJ must consider the following factors before declining to give any weight to the opinions of a treating doctor: length of treatment, frequency of examination, nature and extent of relationship, support provided by other evidence, consistency of opinion with record, and specialization. *Id.* at 621 (citing *Newton,* 209 F.3d at 456). The ALJ did not consider those factors in this case. As noted in Myers, "[T]his is a case where the ALJ summarily rejected the opinions of [claimant's] treating physician, based only on the testimony of a non-specialty medical expert who had not examined

the claimant." *Id.* at 621 (quoting *Newton*, 209 F.3d at 458). The undersigned finds that this constitutes error.

The record reflects that claimant's onset date was March 10, 2002, which was about two weeks post-accident. (Tr. 113). Subsequently, he saw Dr. Ozanne, an orthopedic surgeon, who diagnosed him with lumbar spinal stenosis and recommended surgery. (Tr. 137). He then saw another orthopedic surgeon, Dr. Medley, who diagnosed him with a herniated disc with right side nerve root compression, for which surgery was indicated. (Tr. 129-30). A third orthopedic surgeon, Dr. Pribil, performed the surgery on May 9, 2003. (Tr. 194). A month later, Dr. Pribil indicated that the surgery had failed, and that claimant was "permanently totally disabled." (Tr. 210). On December 9, 2004, Dr. Pribil discharged claimant to the care of a pain management specialist. (Tr. 273). No medical records exist in the file subsequent to this date. Thus, I find that claimant is entitled to a period of disability from the date of onset until the date that he was discharged from his treating physician's care.

Accordingly, it is my recommendation that the Commissioner's decision be **REVERSED**, and the claimant be awarded benefits. The undersigned recommends that claimant be awarded a closed period of benefits from March 10, 2002 through December 9, 2004.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and F.R.Civ.Proc. 72(b), parties aggrieved by this recommendation have ten (10) business days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within ten (10) days after being served with a copy thereof. Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

**FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FACTUAL FINDINGS AND/OR THE PROPOSED LEGAL CONCLUSIONS REFLECTED IN THIS REPORT AND RECOMMENDATION WITHIN TEN (10) DAYS FOLLOWING THE DATE OF ITS SERVICE, OR WITHIN THE TIME FRAME AUTHORIZED BY FED.R.CIV.P. 6(b), SHALL BAR AN AGGRIEVED PARTY FROM ATTACKING THE FACTUAL FINDINGS OR THE LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT COURT, EXCEPT UPON GROUNDS OF PLAIN ERROR.** *DOUGLASS V. UNITED SERVICES AUTOMOBILE ASSOCIATION*, 79 F.3D 1415 (5TH CIR. 1996).

Signed July 5, 2006, at Lafayette, Louisiana.

COPY SENT:
DATE: 7-5-06
BY: gfr
TO: RFD
CMH

C. MICHAEL HILL
UNITED STATES MAGISTRATE JUDGE